EX PARTE HENRY WILLIAMS.

No. 1872.  Decided October 19, 1898.

**1.  Habeas Corpus in Vacation—Transcript, How Certified—Practice on Appeal.**

Where an appeal is taken from a judgment in habeas corpus proceedings heard by the judge in vacation, the record must be certified by the judge; and, unless this has been done, the appeal will be dismissed.

### ON THE MERITS.

**2.  Habeas Corpus for Bail—Proof Not Evident.**

See facts stated on a habeas corpus hearing for bail in a murder case which the court hold not to be proof evident of murder in the first degree, and that relator is entitled to bail, which is granted.

APPEAL from Erath.  Tried below, in vacation, before Hon. J. S. STRAUGHAN.

Relator having been committed at an examining trial for the murder of one Austin King, on Monday, the 8th of August, 1898, sued out a writ of habeas corpus for bail, which writ was heard by Hon. J. S. Straughan in vacation, and bail refused; and from said judgment refusing bail, relator prosecutes this appeal.

The appeal was dismissed because the transcript of the record was not properly certified by the trial judge.  Subsequently, relator having procured a proper certificate to the record, the judgment of dismissal was set aside and the case determined upon its merits, resulting in a reversal of the judgment and the awarding of bail to relator as shown by the second opinion, infra.

The deceased, Austin King, was one of the proprietors of the Erath Appeal, a newspaper published in the town of Stephenville.  On the 4th of August, 1898, the following article appeared in the columns of the Appeal:

"Negro and White Woman Scrap.—On last Saturday there was a lively scrap on aristocratic College Hill, between two women of different complexion—one a beautiful blonde, and the other as black as the king of hades.  The story as told a reporter of the Appeal is about as follows: Mrs. Williams, nee Mrs. Skipper, has a little boy some seven or eight years old, who got into a childish difficulty, as children of that age sometimes do, with a little pickaninny belonging to Tish Adams, and during the fray the young Skipper hit the nigger with a rock on the head, hurting him severely.  The mother of the coon went to Mrs. Williams, bringing with her her boy, to show cause why Mrs. Williams should not severely chastise her pugilistic offspring for spilling African blood.  Mrs. Williams could not see the propriety of belaboring her boy in that light, but went into the house and came out armed with a buggy whip, which she proposed to wear out on the she coon.  By this time Tish had worked

up her fighting qualities to a white heat, and dared her to use that whip on her black hide; and on the first demonstration the coon gave Mrs. Williams a tap on the proboscis and at the same time got possession of the whip with which she flailed Mrs. Williams' plump person hard and fast, until the nigger got exhausted and Mrs. Williams fell to the ground in a swoon. It is alleged on good authority that the husband of Mrs. Williams stood there a silent witness to this dastardly outrage, and if such be the case a respectable committee of white women should wait on the woman who bears his name and request her to sue for an immediate divorce, for no man but a skulking cur would stand by and see a white woman whipped by a nigger. It may be the custom in Indiana, but it won't stand muster in Texas. It is further stated by our authority, that after the flogging this eunuch monstrosity had the gall to bring his wife a butcher knife and tell her to use it on the black woman. The nigger told him he was a coward, and if any one had a right to use that knife it was him."

On the habeas corpus hearing the above article was the only evidence offered as to the merits of the case by the applicants; the other evidence submitted by them related solely to their ability to give bail.

In substance, the evidence for the State was that on Saturday evening before the killing, Williams and his wife, who had just returned to town from a visit in the country, heard of the publication, and Williams bought a copy of the paper. After reading the article, Williams and his wife got in a buggy and called upon Eugene Moore, who was running another newspaper in the town, and had a conversation with him about the article and the proprietors of the Appeal, who they were and where they lived, they (Williams and wife) not being acquainted with them. They spoke of bringing a suit and of prosecuting them. Williams was excited and said "if he could find those boys he would teach them how to write up his wife." Mrs. Williams said "if she could find them she would show them she could horsewhip somebody besides a negro." Moore advised them not to do anything rash, or take the law into their own hands, and, from their manner when they left him, he did not think there would be any trouble.

On Monday morning, about 8 or 9 o'clock, Williams and wife, accompanied by a son of Mrs. Williams by a former marriage, came down town in a buggy, and Williams tried to procure a pistol from one or two parties to whom he applied, but failed to get one. Mrs. Williams went in her buggy with her son to the store of W. M. Leonard, where she bought a buggy whip from Leonard. After this the three parties got in the buggy and drove to the office where the Appeal paper was printed and went upstairs into the printing office, where they requested a negro, Crockett Dunn, who was porter in the office, to tell Mr. King to come up there, as they wished to see him. King came, and Williams commenced reading the article to him, and they began disputing about it in an angry manner. Williams was heard to say, "I will hold you, or make

you stand while my wife whips you;" and then three licks, as if made with a whip, were heard; when Dunn, the negro, and Charley Wilson, whom he had called, rushed into the room, when the parties were found struggling for the possession of the whip. In the scuffle, King struck Mrs. Williams one or more blows in the ·face with his fists. Wilson caught Mrs. Williams by the shoulder and pulled her back, and got between her and her husband and King, who were fighting. King hallooed to Collins to catch Williams,—that he was stabbed. About the time Wilson grabbed Williams, other parties came in and they were separated. As Wilson led King down the stairway, he says, "I asked him if he was hurt much. I also said, he has stabbed you." He said, "No; she is the one that did the work." It seems from the testimony of both Dunn and Wilson that each thought that Williams,. and not Mrs. Williams, had done the stabbing.

L. N. Walker, who met the parties as they came down the stairway, testified that Wilson said to him, "Help me get him down the steps. Williams has cut him all to pieces." And Austin King said: "No, he didn't do it; she did it." Ben Young testified also to this statement by King.

Sam Russell testified: "I am constable of this precinct, No. 1. I saw Harry Williams and his wife last Monday morning. I saw them in King & Leonard's printing office. I went up there, for I was notified that there would be trouble there. When I went up in the office there were several men up there. Charley Wilson, Ben Young, Jess Patton, Charley Fair, Mr. Williams, Mrs. Williams, and Frank Heizer, Mrs. Williams' son, were up there. When I got up there, I suppose from the attitude the fight was over. Charley was at the right of the door, just as I went in, and had his arms around King. He did not have his arms around Mr. Williams. Mr. Williams was to the left of Charley, and King was about in the center of the room and was facing King and Wilson. It seemed that Williams was trying to fight, as he had his arms in a striking position. I could not tell, but I think that some one shoved him back, but I did not see that. Williams said there, after I caught him, that his wife had been written up by King in a disgraceful shape, and that he could not stand it; and that he wouldn't stand it. He said a good many things, but I can not remember the exact words. He said something about them slandering his wife. Mrs. Williams was a little behind, to the left from him, and next to the wall, and to the left of the south door, facing north. She had something in her hand, and I thought that it was a large spoon, and it had a piece of paper around it then. I afterwards learned, in the justice's office, that it was a dirk knife. There was a piece of thick, heavy red paper around it. She handed that knife to Mr. Freeman after we got to the courthouse. I heard her say in the printing office that King had wrote her up in his paper, and that they came over here for revenge; and that the law would protect her, as she was preserving her character. She said that there were about three more men that she would like to get revenge out of. She said that they had come

up there for revenge, and that they had got it. She did not say anything about any cutting, and I did not know at that time there was any cutting done. We started on down stairs, and she showed me where she was struck by King on the head, and she said she wouldn't have tried to hurt him (King) if he had not struck her. So we got about to the bottom of the steps, and I did not pay much attention to her until we got to the foot of the stairs. King said something about a doctor at the foot of the stairs. I turned Williams loose and jumped forward and asked King if he was hurt, and he said 'Yes; I am bleeding to death.' She said that she hoped that it would kill him. If it didn't, that she would. I hurried her and Williams to the courthouse, and I thought that the man was hurt pretty bad, and I wanted to get them out of the way as soon as I could. All that she said, I think, was in the presence of her husband. She was a little behind of him."

Cross-examined: "When I got to these people, and during this conversation, these people seemed very much mad and very much excited, in my judgment. They were a little nervous and trembly. She showed me where King had struck her twice on the head. Right about the left temple there was a red place and a knot. She told me to look what a knot he had made, and there was a red place on the other side. She said that that was where King struck her. She said that if he had not struck her she would not have tried to hurt him. This, I believe, is what she said about it. There was no further fact that she said so far as I was asked. They talked a whole lot that I can not remember, and were excited in that talk. They seemed to be complaining about that article in the paper about that white woman and negro having a fight."

Frank Freeman testified: "After that cutting was done, on Monday morning last, the first time that I saw the defendants was in the courthouse here. I heard that King was cut, and I asked where Williams was, and I was told that Sam Russell had brought him to the courthouse. When I got over to where I found King lying on the floor, in Wilson's saloon, I saw King, and then came right to the courthouse. I was gone a very short time. It would not take a person over two or three minutes to walk from where King was to the courthouse. When I got here Sam Russell had them in the justice's office, and I went in there, and Williams was sitting there and started to read that piece in the Appeal. When I got over there it seemed that they had just got King down. It was about three or four minutes after that I had a conversation with Mrs. Williams in the justice's courtroom. When I first got to King, in Wilson's saloon, King was lying on his face and he was bleeding freely, and the blood had not run over a foot and a half from his body. I did not stay longer than I could find out who did it. When I first left, the blood extended to a foot and a half or two feet further than it was. I remained there only a few seconds, enough to find out who done it and where they were. They told me there that Sam Russell had brought Williams to my office. I ran upstairs and found them in Judge Young's office. I told Mr. Russell that we had better get that man in jail. There were several peo-

ple around there. When I told Russell that, I told Williams to go with me, and I took him and started out of the room. When we got near the door Mrs. Williams got up and followed me, and asked me what I was going to do. I told her that I was going to put Mr. Williams in jail, and she said that she was the one to take; that she cut him herself, and if I taken him she would go, too. I asked her what she cut him with, and she did not make me any reply that I remember of, but I saw something in her hand wrapped up in a paper, and I took it away from her, and it was a dirk knife. I told her then that I would take her, too, and I carried them to jail. [He identifies the knife as being bent, like it was when he got it.] There was no scabbard on the knife then. It is bent right at the guard. The point appears to be a fraction blunted, but it is what you might call a sharp point yet. I do not remember anything else that she said."

The dying declaration of Austin King was read, as follows:

"Stephenville, Texas, August 8, 1898.—The State of Texas, County of Erath.—My name is Austin King, and I am personally known to Mr. and Mrs. Williams. They came to my office about 9 o'clock in the morning of August 8, A. D. 1898. I was not in my office. They sent for me. Mrs. Williams began whipping me with a buggy whip. Mr. Williams pounded me with his fists. While they did this, Mrs. Williams cut me twice with a knife. When they came in I treated them perfectly gentlemanly. They added insult after insult. I said, 'I will make any kind of correction you want.' Mrs. Williams said, 'I have come after revenge.' She told her boy, who was behind her, to hand her the whip. She then took the whip from him and began whipping me. I took the whip away from her, and then Mr. Williams jumped on me, and while Williams and I were wrestling Mrs. Williams stabbed me twice with a knife, and then I backed off out of her reach, and Charley Wilson came in between them and separated them. I then went down stairs in front of them, but I was then so weak from loss of blood that I fell. I did not write the article which gave them offense. I did not know it was going in the paper until it was set up. I make this statement conscious of what I am saying, and in view of the fact that death is imminent.

Dr. Williamson testified that King was stabbed twice; that the wounds were fatal, and that King died from the effect of the wounds in about thirty-two hours.

The knife with which the stabbing was done was a dirk which Williams had bought from W. M. Leonard some four or five months before the homicide. The blade was four inches long.

*Martin & George,* for relator.

*W. J. Oxford, Nugent & Kearby,* and *Mann Trice,* Assistant Attorney-General, for respondent.

DAVIDSON, Judge.—Appellant was arrested charged with the murder of Austin King, and resorted to the writ of habeas corpus to secure bail. Upon the hearing of the case in vacation he was remanded to custody, without bond; hence this appeal.

Upon an examination of the record, we find that it is not certified by the judge, as required by the statute. For this reason we can not entertain jurisdiction of this appeal. See Ex Parte Malone, 35 Texas Crim. Rep., 297. There are several other cases following the Malone Case, but we deem it unnecessary to cite them. The appeal is accordingly dismissed.

*Appeal dismissed.*

Hurt, Presiding Judge, absent.

After the dismissal of the appeal, relator cured the defect in the transcript as pointed out in the above opinion by having the same properly certified by the judge who tried the case, and upon his motion the judgment of dismissal was set aside and the cause reinstated upon the docket, and the following is the opinion upon the merits, delivered November 2, 1898:

## OPINION UPON THE MERITS.

DAVIDSON, Judge.—Relator was arrested upon the charge of murder and resorted to the writ of habeas corpus for the purpose of securing bail. Upon the trial under said habeas corpus proceedings the charge against him was held nonbailable. We have carefully examined the record, and are of opinion that the judgment was erroneous, and that relator is entitled to bail. While we refrain from discussing the evidence, after a careful examination of the same we have arrived at the conclusion above stated. We therefore fix the amount of bail at $3000. Upon the execution of a bond by relator in said amount, in the terms and under the requirements of the law, the officer holding relator will release him.

*The judgment is reversed, and bail fixed at $3000.*